Mr. Brooks, and Mr. Miller? Yes, Your Honor. Okay, nice to see you both. Welcome. You may begin. Thank you, Your Honor. May it please the Court, Counsel. I'd like to spend my time this morning dealing with the question of whether Mr. Bonan's Seventh Amendment right to a trial by jury was violated. And the Supreme Court last year in Jharkissi answered that question in the affirmative. The FDIC, well, the Supreme Court made clear that there is a two-part analysis to be done here. First is to determine whether the Seventh Amendment is implicated at all, based on both the substance of the case, whether it's from common law roots, and the remedy that's being requested. Here, the Court does not need to spend much time on that, as the FDIC has conceded that the Seventh Amendment is implicated here. So, we go to the second step of the analysis, the FDIC claiming that this case falls under the narrow exception, what has been called the narrow exception by the Jharkissi Court as well as its predecessor opinions, of the public rights doctrine. And in order to answer that question, the Jharkissi Court made it very clear that there is one ultimate question that must be answered to determine if something falls within the public rights exception, and that is, what is the substance of the underlying suit? The Jharkissi Court mentioned that term numerous times. For example, at page 134, it says, quote, even when an action originates in a newly fashioned regulatory scheme, what matters is the substance of the action, not where Congress is assigned it, close quote. Again, at page 135, the Supreme Court said, quote, again, what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. And in this case, Your Honors, the substance of the suit here are common law claims. We raised this at our opening brief, and I find it interesting to note that the FDIC has not taken issue with this in their opposing brief. We point out in our opening brief that Mr. Bonin was charged by the FDIC, for example, with breach of fiduciary duty, which is a common law claim. The FDIC does not take issue with that. We point out that Mr. Bonin was charged with conducting unsafe and unsound business banking practices, and we analogize that to professional malpractice, again, something that was known to the common law long before the Seventh Amendment was written. And again, in their briefing, the FDIC takes no issue with that proposition. There are two other things in the charging and in what the ALJ looked at and the FDIC looked at, actually, that go back to the common law as well, which we did not emphasize in our brief, but I do want to point out here. One of the other things that the FDIC charged or claimed that Mr. Bonin was guilty of was personal dishonesty. That equals fraud. That is one of the terms that's used in the culpability prong of 1818. And in the charging document, in the notice of charges at paragraph 122, the FDIC claimed, quote, the acts, omissions, and practices of the respondent alleged above demonstrate the respondent's personal dishonesty under 12 U.S.C. 1818E. That is fraud. That is jarkusy. Okay, the E is the prohibition order, I is the civil monetary penalty, correct? Yes, Your Honor. Okay. Yes, Your Honor. But the law is also clear that if he has a common law right under the monetary penalty to a jury trial, if he has a Seventh Amendment right, all of them are going to end up in the jury trial. I don't see what the FDIC says. Yes, Your Honor. But I think you all may be in agreement on that, right? So in the first instance, our focus should be on the civil monetary penalty and I. And if there's a Seventh Amendment right, and if it's not subject to the public rights exception, he would have a jury trial right on it. And then, my word's not yours, the E prohibition order claim would kind of tag along, right? Yes, I would agree with that. So if it's a jury trial, is that the way you have thought about it? Yes, Your Honor. And I think U.S. v. Toll I think supports that.  The other interesting point that I want to bring as far as the substance of the suit here. Do you mind pulling that thread? I'm sorry, Your Honor? Do you mind pulling that thread just a little bit and walking us through how are you characterizing that civil monetary penalty? As far as legal in nature, are we... Certainly. The civil monetary penalty is clearly a legal remedy. By the words of the FDIC itself, in their regs, et cetera, it is a punitive penalty. It is not there to give money back to the bank or any of the depositors. It is not there for any other purpose other than punishment of the respondent and deterrence, further deterrence. And the Supreme Court has made very clear, in tragedy and other cases, that a civil penalty, a monetary penalty, was something that was enforceable only in the legal courts, the common law, not in courts of equity. So when you get to the first... And that's why it's so clear, and I believe that's why the FDIC has agreed that the Seventh Amendment is so clearly a legal remedy. And as the Court of Juracracy and other cases note, the type of remedy is the most important thing to look at in the initial question of whether the Seventh Amendment is implicated. And so that, I think, is a very clear line here that I don't think the sides disagree about. Yes, Your Honor. Go ahead. I'll let Judge Pyer finish. Anything further you want to say on that? No, no, Your Honor. Thank you. Can I stay with the same kind of thought with the question? That is, the FDIC definitely has a point that the insurance program, the deposit insurance program, and if the premiums prove insufficient, backed by the full faith and credit of the public benefit. The question I have is, does that observation, if it's just factually descriptive, does it bring the program close enough to the Supreme Court's public benefits cases to trigger the exception? You know the cases I'm talking about? I do, Your Honor. Yes. And I appreciate the Court's question. I think that is, frankly, the most important question that the FDIC raises in this case, and the answer is no, it does not. And for several different reasons. What the FDIC is trying to do here, and I don't blame them, but what they're trying to do is broaden the definition of public benefit that is used by the Supreme Court. In the Jarkissi case, the term public benefit comes up on page 130 of that opinion. And what Jarkissi does there is, the Jarkissi Court cites to, in talking about the types of things that fall within the public rights doctrine, it says, quote, the granting of public benefits, it lists immigration, taxation, et cetera, and then it says, quote, the granting of public benefits such as payments to veterans, pensions, and patent rights. That's at page 130. The citation to that by the Jarkissi Court is to Crowley-Vinson, which is a 1932 admiralty case that the Supreme Court heard. Cite is 285 U.S. 22. And it cites to page 51 of that opinion, and that's where the Crowley Court, Supreme Court, lists the areas of public rights, and it lists them as, such as taxation, immigration, pensions, and payments to veterans. It doesn't use the term public benefits, but it has a footnote, which lists all the cases that it's referring to. I've read all of those cases. And there are only two cases in that list of footnote 13 that the Supreme Court relies on, that apparently the Supreme Court relied on in Jarkissi to use the term public benefit. And those are the Silvershine case, 266 U.S. 221, 1924 case, which deals with an army payment of disability payments to a veteran. And we have the patent rights and the pensions. Patent rights, yes, Your Honor. And then the Babcock case, 250 U.S. 328, 1919, which dealt with a payment to a soldier for a lost horse and personal belongings. So the public benefits that Jarkissi, if you go back, if you pull that thread to what that term means in the context we're talking about, we're talking about direct benefits to an individual or perhaps a group of individuals suing the government or having a dispute with the government over whether they are entitled to those specific benefits. That's why Social Security we're not talking about here. Those are direct payments from the government to an individual. That's not what we're talking about in the terms of the FDIC, certainly in terms of this case. You have to get many steps down the road here before you're dealing with payments to an individual. Remember that the, going back to the substance of this suit, this suit did not, and the claims here, did not have to do with deposits. It had to do with two commercial loans. So the FDIC insures deposits only. So the base allegations here have nothing to do with insured deposits at all. So in order to get to the public fisc eventually, which is what the FDIC is asking you to do, one would have to assume that the loans were so bad that somehow it makes the bank go underwater, and underwater to the extent that deposits are lost, that depositors start suing, and that the FDIC comes in and takes over the bank and starts having to pay out of the public fisc. That is many, many steps removed from the public benefit cases that the Supreme Court has recognized. And there's one other interesting point. This suit was brought under 1818. If you go to 1821, specifically 1821 Title 12, 1821 D6A, 1821 is the section in which the FDIC can take over a bank, the receiver, because the bank's failing. Now we're talking about a situation where the public fisc might be at risk, because you have a failing bank where the FDIC has come in to take it over. And under that section of 1821, Congress allows for claimants, depositors, to bring suits in Article III courts. So if Congress believed... Can you just finish that sentence?  To do what? A claimant, somebody who has a claim against the failing bank, can bring their claim either to the FDIC or to the district court. Right. That's what the statute says. What's the nature of the claim, though? The claim was for deposits. It's not to collect a monetary remedy of basically the insurance. Exactly. Exactly, Your Honor. So in the situation that the FDIC is talking about here, the very situation where this list of horribles occurs and deposits are finally touched, jury trials can be used. And so when you put all that together, I would submit to the court, although I understand why the FDIC is trying to go down that road, it is a road too far, and it is an exception that would swallow the rule. One could probably... Yes, Your Honor. Just one moment there. Let's back up for a minute. I know that the FDIC has spent a lot of time talking about why, in particular, there's an interest in this is a highly regulated government area. This is going back to that public rights exception and why it would fall kind of with those veterans benefits tariffs. So how would you respond to that if we want to accept that the deposits were not considered? But back up just for a moment and say, well, globally, this was the impetus behind FDIC. This is why the FDIC was put in place.  Yeah. Several responses, Your Honor. First of all, that's why the SEC was there. The Supreme Court recognized in jarcossy that the SEC was there to protect the investing public. One, I think, regardless of how one sits on the political spectrum, I think we could probably all agree that virtually every federal agency is there to try and benefit the public. So if that's the test, if that's the exception, it follows the rule. That's the primary response to that. The secondary response, I think, is going back to what I said before. We have to remember that the public rights exception is an exception. It is termed a narrow exception. And I think, and I don't have this quote right in front of me, but in jarcossy, again, the court states, and I believe it's citing to Murray, Murray v. Lassie, I believe in this quote, states that if there's any ambiguity, if it's within the realm, if it's possibly a public rights exception, the assumption still is, the presumption is that there is a Seventh Amendment right. It's got to be squarely full on in the public rights arena. And the reason for that is right in front of the court today in this case. I don't want to get on a soapbox here. But I understand that the court is concerned with very important constitutional issues here. But in every case, it comes down eventually to an individual or a company. And what we have here is an individual, a citizen of the United States, who, without a jury of his peers, with the FDIC making all the credibility determinations, and that's what all these decisions were based on, who's experts to believe, who's telling the truth, who's not telling the truth. Based on that, his livelihood has been taken away from him. And he has been fined over $100,000. That's not the way the Constitution should be read. It should not be a situation that even when you arguably can come up with a series of public fisc, that because of that, an individual citizen can be fined and can be prohibited from following his or her career path for the rest of his or her life based on an administrative agency's determination of who's telling the truth and who makes sense and who doesn't. It's just not right. I don't know how else to say it. I know that's not a term we use sometimes in law, but it's not. You want to save some time to respond to the FDIC? I would like to, Your Honor. Yes. Thank you very much. I appreciate the Court's attention and questions. Yep. You're quite welcome. Okay. Mr. Brooks, nice to see you whenever you're ready. Good morning, Your Honors, and may it please the Court. I am Joseph Brooks from the FDIC's Legal Division. I want to focus the Court's attention on one sentence from the Jarcosi decision and three cases. As relevant here, the Jarcosi decision states what it held and why in a single sentence. Quote, the public rights exception did not apply there because the SEC securities fraud action did not fall within any of the distinctive areas involving governmental prerogatives where the Court has concluded that a matter may be resolved outside of an Article III court without a jury. That's at 603 U.S. 120. Three cases show that this case does fall not within one but two such distinct areas involving governmental prerogatives. I'd like to begin at the beginning with Murray's lessee. While Jarcosi stated that Murray's lessee involved the, quote, power to collect revenue, the Murray decision itself actually relies on the narrower included power, quote, to use appropriate means to secure the due application of public money. That's 59 U.S. at 281, which is just another way of saying to safeguard public funds. Murray upheld a non-Article III procedure for the Treasury Department to make an initial determination of whether funds collected by a customs duty collector were being wrongfully held by him and also to enforce a remedy including taking of property. And importantly, as the Supreme Court noted there, the question whether a collector of the customs is indebted to the United States may be one of judicial cognizance. It is competent for the United States to sue any of its debtors in a court of law. Here, Section 1818 similarly provides a non-Article III court procedure to make the initial determination of whether a respondent's conduct threatens, quote, the due application of public money in the distinctive area of the deposit insurance fund. The second case, which is the follow-on to Murray's lessee for purposes of my argument, is the more modern recent case in Simpson v. OTS in which the Ninth Circuit determined that a primary purpose of enforcing bank regulation laws, in other words, of Section 1818, because that's what it does, it enforces bank regulation laws, one of its primary purposes is, quote, safeguarding the federal insurance fund. And for that reason, in Simpson, the Ninth Circuit held that Section 1818 proceedings fall within the public rights exception. My friend says in their reply brief that the analysis in Simpson wasn't significant enough, sufficient enough. But your honors will find that 29 F. 3rd, 1422 to 24, the Ninth Circuit analyzed both the Seventh Circuit and Article III with respect to the public rights doctrine over two full pages of the Federal Reporter. And as we point out in our briefs, there are similar holdings by the Fifth Circuit in Aiken and there's a similar holding by the Second Circuit in Cavallari, all three cases holding that Section 1818 enforcement proceedings, because they safeguard the federal insurance fund, fall within the public rights doctrine. Mr. Brooks, can I, one of the points that Mr. Miller makes in his brief, and I think it's implicit in his argument here, is, and I just want to get the benefit of your response to it, because I think your comments draw it out, is that your analysis is proceeding at a higher level of generality with respect to a public benefit or the public fisc being at risk than the law permits after jarcossy. How do you react to that? You know what I mean? It's how much do you, the whole back and forth, and I understand, I mean, you all have done a very good job at it, too. You know, how much do you want to zoom in or zoom out on the claim and where the claim sits within the broader regulatory scheme? Well, I'm happy to zoom in, Your Honor, but I want to make clear with respect to two different issues, the one that I've just been discussing and that you've referred to, which is safeguarding the federal insurance fund. I'll answer your question as to that, and then I want to move on and I'll answer your question as to the second ground. It's an independent ground, and that's the granting of a public benefit. With respect to the federal insurance fund, keep in mind what the Supreme Court said in jarcossy is that you need a matter that falls within a distinctive area, one requirement, that involves a governmental prerogative. The governmental prerogative identified in Murray's lessee and reconfirmed in jarcossy is collecting the revenue, but as I pointed out, Murray's lessee was more specific. It was ensuring the due application of the revenue, the same thing as safeguarding public funds. I'm sorry. Can you repeat that? The volume went down too low. I'm sorry, Your Honor. What I was saying is that in Murray's lessee, the Supreme Court identified the governmental prerogative and the distinctive area more narrowly. It said it was providing whatever means are appropriate for the due application of public money. It's not just collecting. The court specifically pointed out the governmental prerogative doesn't end when the money is  The government has the right to use the words of the court, appropriate means to ensure the due application of public money. In that case, the due application of public money they were concerned about were customs duties that were in the hands of a customs collector. Here, the governmental prerogative is again due application of public money, same as Murray's lessee. The distinctive area is the Federal Deposit Insurance Fund. No time before the Federal Deposit Insurance Fund was created was there ever anything like it before. The Federal Deposit Insurance Fund is clearly public money by statute and otherwise. As pointed out during the last presentation, it is backed up by the full faith and credit of the United States. Now, we're not saying everything that involves that. What we're saying is enforcement proceedings, which is the Ninth Circuit held, primary purpose of which are to safeguard public funds, that is a very distinctive area. That is as broad as our argument goes. Mr. Brooks, what page of your brief do you discuss Murray's lessee? We do not discuss Murray's lessee specifically. Isn't that a problem? Don't we have a rule that you're not supposed to come in here and talk about cases that you don't cite in your brief? Well, Your Honor, I would make two points on that. The first one is Murray's lessee is discussed at length in the jurisdiction case, which of course we rely on. Right. And Murray's lessee is discussed at length for a single proposition, and that is that the safeguarding of public funds, the collection of the revenue, is a distinctive area within a governmental prerogative. Second of all, I would point out that in the argument that I just stood up to respond to, Murray's lessee was brought up by counsel from the other side. And finally, I would point out, Your Honor, that the whole public rights doctrine was not discussed at all, virtually, just barely mentioned in the opening brief. I'm sorry, counsel. You were going down the path of narrowing down to Judge Scudder's question as well. You said safeguarding, and then you said there's a part two that I'm going to come back to.  Can I just finish closing the loop here? Okay. Okay. I just wanted to point out, Judge Kearse, that because of that virtual non-mention of the public rights doctrine in the opening brief, this today is the FDIC's first opportunity to respond to public rights doctrine questions. Now, the second line that we rely on is government benefits. And we rely on the Union Carbide case, which held that Congress properly can require disputes between pesticide license applicants to be resolved by arbitration. Now, my brother said that the FDIC's federal deposit insurance is kind of an off-the-wall thing. Well, it's certainly at least as important and as vital as pesticide licenses. The reason why, the Supreme Court said, was twofold. First of all, Congress could require disputes between voluntary participants in a complex regulatory scheme to be resolved without providing an Article III adjudication. And second of all, it could condition the issuance of licenses on compliance with agency procedures. That is precisely what Congress did here. It conditioned a bank's receipt of government-benefited FDIC insurance on voluntary participation in the FDIC deposit insurance program. Indeed, Section 1818 applies only to insured depository institutions and their individual parties that are affiliated with them. One critical point here vis-a-vis JARCISI. The investment advisor in JARCISI and the two funds that were involved were not registered with the FDIC. That means that JARCISI had no voluntary participation by government. It had no government benefit offered to anyone in that case. And there was no safeguarding of any public funds. Mr. Brooks, I really appreciate you getting into this aspect of it because I have a question that's concerning me about this line of argument that it would really help to hear what you have to say on it. That is, you're kind of, these are my words, obviously not yours. You're kind of saying, well, Mr. Bonin went to work for an institution that itself opted to participate in the program, in the FDIC's insurance program. It's all voluntary. It's not compelled by an act of Congress or by regulation. And by virtue of working at an institution like that, at Grand Rivers, you know, it's almost like he's waived or he's acquiesced in the public benefit aspect of this to a degree that's sufficient to like waive a Seventh Amendment right? This is my interpretation of what you're saying by, with your reasoning through the union carbide point and you're talking about kind of conditional, you know, opting into the FDIC insurance scheme. Am I misconstruing the argument? Maybe only slightly, Your Honor. I understand your point, but I think my response would be, I don't think I would say Mr. Bonin is somebody who chose to go to work for a bank. I would say that Mr. Bonin as a person who was the president of the bank, who was the chairman of the board of directors. Okay, but just step outside the fact pattern for a second, right? If you, if somebody else, I mean, it's not coerced employment is the only point. And I'm not trying to make a point specific to him. I'm just trying to tease out the legal, the legal substance of what you're saying. Right, but in this case, Your Honor, Mr. Bonin as the president and the chairman of the bank, he certainly would have participated in the decision to have that bank, a state bank, choose, have the bank choose to have federal deposit insurance. What legal conclusion follows, though, that he waived his Seventh Amendment right in an 1818 proceeding? He waived his right in the same sense that the manufacturers in Union Carbide waived their right to have disputes over millions of dollars that were owed to each other. The Union Carbide dispute, though, was not, was not a punitive enforcement action against an employee, right? Now, you might say that's of no legal significance, but it, it, it is a reality of the fact pattern that was before the justices there. I think the critical reality in the fact pattern, Your Honor, is that in the absence of the statute at issue there, those manufacturers, the dispute in that case was $50 million, had a basic common law contract action for $50 million. The Supreme Court held that because they voluntarily participated in that program, they had to go to non-binding arbitration. They could not go to an Article III court. I think the parallel is quite direct, Your Honor. Here, we're talking about a bank and the bank's president and the bank's chairman getting the benefit of federal deposit insurance, which is significant, and all that they're required to do is that if they act in a way that threatens the viability of the federal deposit insurance fund, they agree that their conduct and its appropriateness will be decided in the first instance by the FDIC, which is an agency which courts, the Fifth Circuit and the Bruce case in our brief in particular have found, has special expertise for determining what is an unsafe and unsound practice, what constitutes a fiduciary duty in the context of banking. So I believe, Your Honor, quite frankly, that the argument here is stronger. Pesticide licensing, on the one hand, claims up to $50 million between private parties. On the other hand, those are what happen in Union Carbide. Here, we have the Federal Deposit Insurance Fund, public money, a program run by the federal government, and the dispute here is not between private parties. There's no dispute here between Mr. Bond and the bank president and the borrower. The dispute here is between Mr. Bond and the government trying to protect its deposit insurance fund by ensuring that he does not engage in unsafe and unsound practices. I want to point out that in Mr. Bond's reply brief, when he finally did address the public rights doctrine, he conceded that, quote, the public rights exception may be applied in additional or new contexts if evaluated with care. And we're not disagreeing with that. It should be evaluated with care, but clearly can be applied in new contexts, as the Supreme Court has said. More importantly, he concedes that the public rights exception applies to, quote, collection of revenue, unquote, and granting of public benefits, unquote, without any of the specifics voiced today. And that's that reply brief at three. I just want to check real quick and see some questions you may have had. Do you have a thought you wanted to go forward with? Go ahead. I'm more happy to take your questions than to offer my thoughts. Well, we may have a couple. I wanted to see, did you agree with that colloquy that I had with Mr. Miller, that the focus seems to be on the points you all are making around the civil monetary penalty and that the, what is it, the 1818E prohibition order claim, or I think that's what we're calling it, right, that that kind of tags along? Your Honor, yes, because we're not disputing that you have a common law remedy here. CMP is a common law remedy. And we think the jargons here was clear. While you can do the analysis of whether this claim exists or didn't exist, that was dispositive. We think it's dispositive here of whether the Seventh Amendment applies. Yeah, on the first step, is it implicated? That's right. There's absolutely no issue about that. And the context that you're talking about, in our view, doesn't matter much at all after that. The issue here is the public rights exception. And I have to be very clear about this. It's not an exception to the Seventh Amendment. The public rights exception is an exception to Article III jurisdiction. Yeah, you're right about that. So I think that, you know, where there's a lot of attempt to, like, muddy the waters with, you know, what this was and wasn't, it was the focus of the opening brief, the parties really don't dispute that. We do not deny that the Seventh Amendment is implicated for the reason that there's a civil money penalty. And I think maybe what you were going to is, yeah, because these things were all tried in the same hearing, the facts overlapped. They weren't separate hearings for E claims and I claims. Because one of the claims included a legal remedy, we don't dispute that the jury trial right needs to be evaluated across all of the claims. Yeah, I appreciate the candor. And if Your Honor has any questions, I'm going to have a point or two, but I certainly want to make sure you've all asked anything you want to ask. The one other point that I would make is Mr. Bonin argues that the FDIC deposit insurance fund applies only to deposits and therefore it doesn't apply here and that the enforcement proceedings don't apply here. With all due respect, that is just a fundamental misunderstanding of how banks work. The issue with unsafe and unsound practices is not whether a bank has proper lockboxes or is properly taking care of your deposits, it's what it's done with them. And the only way a bank makes money is not by holding your deposit, it loans them out. The whole issue is unsafe and unsound loan practices. And to say that the FDIC insurance fund is not threatened unless it involves a specific depositor claim and to ignore the fact that the most important risk, this is the Horn testimony that is alluded to in my brother's brief, that the most important risk in a bank is making sure that loans have, that there's an ability by the borrower to repay the loan. So that's what the enforcement thing is all about. And a final point I'd make is Mr. Bonin was, excuse me, the counsel was pointing out that under 1821, which is claims by receivership, that that's where you're really concerned, that's where the FDIC deposit insurance fund is concerned. Absolutely wrong. Absolutely wrong. No, I think, yeah, go ahead. I mean, depositors' claims, the FDIC succeeds to that. Depositors are covered up to the amount of the insurance by money that comes out of the fund. The receiver can try to recover some of that money, but basically the receiver stands in the shoes of the bank and recovers what the bank can recover. And the whole point at the beginning that I made, what we're talking about here, the governmental prerogative here is safeguarding public funds. Once that money has been lost, once banks have failed, and sometimes once one goes they start going, it's too late. The money's gone. It'll never be recovered under 1821. Unless the court has further questions, I see my time is up. Okay. Mr. Brooks, very well. Thank you for your time and the petition should be denied. Thank you, Your Honor. You're quite welcome. Mr. Miller, you had some time left if you care to use it. I will, Your Honor. Thank you. If it pleases the court, let me address a few of the things brought up by counsel in no particular order. Judge Scudder, I think you put your finger on the point here when you were talking with counsel regarding the Union Carbide case and that that was not an individual. That was the companies involved. And I believe counsel pointed out something about, well, that wasn't a punitive action against an employee. That's the point. One of the distinctions of Union Carbide was there was no civil monetary penalty there. There was no clearly legal remedy that was being sought in that case. Here we have an individual, an employee, be it a president or otherwise, who is being fined and then barred by the institution without his Seventh Amendment right. And that does take it out into a different area. I mean, there's a lot of other reasons why Union Carbide does not apply here, not the least of which is you're dealing with a situation where the overlying industry, the pesticide regulations, are something clearly not known in common law. Banking has been known in common law, predates common law by hundreds of years, predates the Seventh Amendment by hundreds of years. So we're not talking about a brand new topic that the federal government is getting involved in even though it did not exist in common law. Let me talk about a couple other points that were brought up. In counsel's reference to Murray's lessee, he said part of what Murray's lessee talked about was the due application of public monies. Well, my reading of that term does not mean protecting money the government already has. You were talking in that case about bringing in customs duties and then the application of that money. Where does it go? Where does the money go? There is no public benefit case that I've seen, Seventh Amendment public benefit case, that talks about safeguarding government funds, which is what counsel just said we're talking about here. We've seen public benefit cases where there's a dispute about whether an individual is owed government funds. There's a dispute about whether the government should be collecting certain funds. I am not aware of a single public benefits case that the Supreme Court has ruled on where the basis of the public benefit was, quote, safeguarding government funds. And, in fact, it doesn't quite say safeguard, but in jarcossy, the Supreme Court said at page 140, effects like increasing efficiency and reducing public costs are not enough to trigger the exception. That's as close as it gets, and in the jarcossy case, it says that's not enough. I think you do have to look at this, and again, Your Honor asked questions about high level versus low level, and I think that is an important thing to consider. You know, when you're looking at some of the other public benefit cases, it makes much more sense at both a high level and a low level. For example, the Atlas case. The Atlas case dealt with the OSHA Act, okay? And there we're dealing with a brand new era of public safety and worker's safety. And that allows OSHA to enforce regulations dealing with a case that was not known at all at common law, and that is negligence in the air, right? The OSHA can enforce regulations where an employer is allowing an unsafe workspace to occur, regardless of whether someone has actually been injured or not. And so there, when you're looking at it as a whole, you're looking at protecting the public as a whole in an area where common law had not done that before. When you're looking at jarcossy, though, when you're looking at what the test is, the substantive case, jarcossy keeps talking about the narrow, the lower level. What is the substance of this case? But what do we do when a loan is defaulted? I'm sorry? That's where the FDIC was going. When a loan is defaulted, though, the FDIC protected bank, that money is picked up. The cost of that goes back to the public. That's where he's wanting to get back to. Sure, I understand that, Your Honor, but the way to get back to that is through common law claims, and jarcossy says he can't do that. You know, it's interesting, the counsel referred to in their brief quite a bit, a little bit I think today, about the fact that Congress, the FDIC, it's exclusively can only go through its agency as opposed to the district court, and I recognize my time's up. You can go ahead and finish your answer. Thank you, Your Honor. I appreciate that. What jarcossy looked at was, and the language that they used, is areas in which historically the executive has exclusively had control, and so, for example, when you look at the area like pesticides, like collecting duties, like OSHA, where that idea of negligence of the air didn't occur before, immigration, taxation, all those sorts of things that aren't public benefits, those are things that historically for years and years and years has exclusively been in control of the sovereign. Banking is not. You can add on regulations to change, you know, and to protect the depositors, that sort of thing, but the entire banking scheme is never anything that was always exclusively within the realm of the executive branch, and that's what separates, that's one of the things that separates us from these other cases. Before we conclude, can I ask you a version of the same question? Sure. Okay, I'm going to change the fact pattern on you. Okay. Okay, suppose, and God forbid, nobody wants to see a bank fail. Suppose, for instance, that Grand Rivers in fact failed, okay, and the FDI had to step in and the insurance program was triggered, you know, et cetera, et cetera, and alongside dealing with the failure and covering deposits and all that, these 1818 actions, the same exact ones, were pursued against your client. Would the legal analysis change in your view? No, it would not. And why not? Because jarcossy is very clear that to determine whether it's a public right or a private right, you must look at the substance of the case that's being brought against the individual, and regardless of what the ramifications were of those actions, the case that would have been brought in that situation, assuming it's the same thing where, you know, the same claims are going to be issued. Risky lending, rounding up cronies for loans, all that stuff. It goes right back to common law basis. And, again, I'll get on my soapbox a little bit, Your Honor. There is a difference, I think, when you're dealing with the rights of an individual as opposed to a- So your point then has to be it's not so much that you're disagreeing with Mr. Brooks, that, yeah, at some level, whether I'm hypothetical or otherwise, you know, there is a public interest. The public FISC interest is out there, you know, because if it came to it, the government would back the deposits. Your point is that, yeah, but you need to hold-you still need to focus on the nature of the exact claim at issue and analyze it within the framework that the Supreme Court has most recently provided us in jarcossy. That's correct, Your Honor. And the reason for that, I think one of the reasons, Fred, is there are other ways. If that was the series of horribles that happened here, it's not a matter of, well, can the government do something about the actions that caused that. It's how do they go about it. And the fact that it's just more efficient to do it through an administrative hearing does not make it constitutional. Okay. Anything else? No. Thank you very much for the presentation.  Thank you, Your Honor. Mr. Brooks, thanks to you. Mr. Miller, we really appreciate the high quality of the advocacy. We'll take the appeal under advisement.